UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES,<br><br>  Plaintiff,<br><br>v.<br><br>MIKE VIERSTRA,<br><br>  Defendant. | Case No. 1:10-cr-204-REB<br><br>**ORDER RE DEFENDANT'S MOTION TO DISMISS**<br><br>**Dkt. 37** |

Currently pending before the Court is Defendant's Motion to Dismiss for Lack of Jurisdiction (Dkt. 37). Having fully reviewed the record and the arguments presented at the March 18, 2011 hearing, the Court enters the following order.

## BACKGROUND

Defendant, Mike Vierstra ("Vierstra") is charged with three counts of negligently discharging a pollutant from a point source into the waters of the United States without a permit in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(1)(A). *Superseding Information* (Dkt. 7). The Superseding Information alleges that on or about March 25, June 1, and November 4, 2009, Defendant negligently discharged process wastewater from a concentrated animal feeding operation ("CAFO"), into Low Line Canal, a water of the United States, without a permit for the discharge. *Id.*

Defendant argues that the Superseding Information must be dismissed for lack of jurisdiction, because: (1) the Low Line Canal is not part of the "waters of the United

**ORDER - 1**

States" and (2) the March and November discharges were into the dry bed of Low Line Canal and there is no evidence that the pollutants were carried downstream. However, as explained more fully below, the Government's allegations, if proven, support a finding that the Low Line Canal is a non-navigable tributary eventually discharging water into a navigable water of the United States. In addition, the Low Line Canal is part of a continuous channel with a distinct, open, and direct surface water connection to and from navigable waters for six to eight months out of the year. Accordingly, even though the canal is man-made, lacks an interstate connection, and the flow is seasonal, the Court finds that the Government has made a preliminary showing in support of jurisdiction. The Government's allegations, if proven, support a finding that the Low Line Canal constitutes "waters of the United States" subject to federal Clean Water Act ("CWA").

## ANALYSIS

The Low Line Canal constitutes "waters of the United States." Accordingly, federal CWA jurisdiction attaches, whether the channel is carrying water or dry. This is true, even though, in certain situations, the Low Line Canal might also be deemed a point source.

A.  **The Low Line Canal Constitutes Waters of the United States**

The Government's allegations reflect that the Low Line Canal meets the statutory and regulatory definition of "waters of the United States" as a tributary connected to a navigable waterway. Because water flows through its channel seasonally and continuously for a six to eight month irrigation season each year, it meets both the

"relatively permanent" and "significant nexus" standards set forth in the plurality and concurrent decisions set forth in *Rapanos v. United States,* 547 U.S. 715 (2006).

1. <u>The Low Line Canal, as a Non-Navigable Tributary, Constitutes "Navigable Waters" under Statutory and Regulatory Definitions</u>.

The CWA defines the term "navigable waters" as "the waters of the United States, including territorial seas." 33 U.S.C. § 1362(7). The regulations further define "waters of the United States" as follows:

> (a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
>
> (b) All interstate waters, including interstate "wetlands;"
>
> (c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:
>
>> (1) Which are or could be used by interstate or foreign travelers for recreational or other purposes;
>>
>> (2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
>>
>> (3) Which are used or could be used for industrial purposes by industries in interstate commerce;
>
> (d) All impoundments of waters otherwise defined as waters of the United States under this definition;
>
> (e) Tributaries of waters identified in paragraphs (a) through (d) of this definition;

**ORDER - 3**

> (f) The territorial sea; and
>
> (g) "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) through (f) of this definition.

40 C.F.R. § 122.2.

The allegations support a finding that the Low Line Canal falls within the definition of "waters of the United States" as a tributary of the Snake River. 40 C.F.R. § 122.2(e); *see Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001). A tributary is a "stream which contributes its flow to a larger stream or other body of water." *Headwaters, Inc.*, 243 F.3d 526 at 533 (citing Random House College Dictionary 1402 (rev. ed. 1980)). The Low Line Canal is part of a tributary system that connects to the Snake River, a navigable water. *See Government's Pretrial Memorandum*, p. 17 (Dkt. 29).

The Government alleges:

> Water in Murtaugh Lake comes from small drainages that flow into the lake as well as the major inflow from the Twin Falls Main Canal which diverts water from the Snake River at Milner Dam. Low Line Canal eventually discharges to Deep Creek, a naturally-occurring, perennial stream which in turn discharges into the Snake River, a traditionally navigable water body. The Snake River supports a broad range of industrial, recreational and wildlife activities. It is also a direct tributary of the Columbia River, a navigable waterway with clear interstate and foreign commerce impacts.

*Id.* The Government further alleges that the Low Line Canal carries water for about six to eight months each year, depending upon the length of the irrigation season. *Id.* at p. 24.

**ORDER - 4**

This evidence is sufficient to support a finding that the Low Line Canal, a non-navigable tributary with a direct surface water connection to navigable waters six to eight months of the years constitutes "waters of the United States" for the purposes of the CWA.

Defendant contends this interpretation of the statutory and regulatory definitions for "navigable waters" is foreclosed by the United States Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006). As explained more fully below, the Court's finding is consistent with both the *Rapanos* plurality decision authored by Justice Scalia and the concurring opinion written by Justice Kennedy.

    2.    <u>The Low Line Canal is Subject to Federal CWA Jurisdiction under Both the Plurality Opinion or Justice Kennedy's Concurrence in *Rapanos*.</u>

The *Rapanos* decision has presented trial courts with two challenges. First, the issue in *Rapanos* was the scope of the Army Corps of Engineers jurisdiction under the CWA to issue or require dredge and fill permits over certain isolated wetlands located "near ditches or man-made drains that eventually empty into traditional navigable waters." *Id.* at 729. However, in addressing the scope of "navigable waters," the decision addresses wetlands as well as non-navigable waterways. In addition, the interpretation of "navigable waters" applies to CWA jurisdiction generally, including federal authority over both dredge and fill and discharge permits. *Id.* at 742.

The second challenge posed by *Rapanos* is that no opinion commanded a majority of the Court. (There also was a dissenting opinion authored by Justice Stevens which, as did the plurality opinion, garnered four votes.) While all of the Justices agreed that the

term "waters of the United States" encompasses some waters that are not navigable in the traditional sense, *see id.* at 730-31 (plurality opinion); *id*. at 759 (Kennedy, J., concurring in the judgment); *id*. at 787; (Stevens, J., dissenting); they disagreed on the scope of the term, which resulted in plurality, concurring, and dissenting opinions.

      a.    *The Plurality Opinion and the "Relatively Permanent" Standard*

In the plurality opinion, four justices interpreted the term "waters of the United States" to include "relatively permanent, standing or continuously flowing bodies of water." *Id.* at 732 (quoting Webster's New International Dictionary 2882 (2d ed. 1954)). "The definition refers to water as found in 'streams,' 'oceans,' 'rivers,' 'lakes,' and 'bodies' of water 'forming geological features.'" *Id.* at 732-33. The plurality further explained that "these terms connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows." *Id.* at 733.

In determining what "relatively permanent" might mean, the plurality opinion explained that it excludes "channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* at 739. At the same time, the plurality made clear that this "do[es] not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought" or "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Id*. at 732, n. 5 (emphasis in original).

The plurality decision does not contain precise standards for distinguishing between "intermittent" and "seasonal" waterways, stating "we have no occasion in this litigation to decide exactly when the drying-up of a streambed is continuous and frequent enough to disqualify the channel as a 'water of the United States.'" *Id.* Instead, the decision suggests that "[c]ommon sense and common usage distinguish between a wash and a seasonal river." *Id.*

The Court finds that common sense and common usage forged in the Intermountain West and applied to the Government's evidence would support a finding that the Low Line Canal is "relatively permanent." With water flowing through it on a seasonal basis for six to eight months of the year, the Low Line Canal is "not necessarily" excluded from the definition of "waters of the United States" stated by the plurality in *Rapanos*. *Id*. at 732, n. 5. Moreover, the flow in the Low Line Canal, though seasonal, is recurring, regular, perennial, and substantial. *Government's Pretrial Memorandum*, p. 24 (Dkt. 29). In addition, the Low Line Canal has an ordinary high water mark and a defined bed and bank. *Id.* These allegations support a finding that the Low Line Canal is a "relatively permanent," non-navigable tributary falling within the definition of "waters of the United States."

This holding is consistent with Ninth Court authority, including *United States v. Moses*, 496 F.3d 984 (9th Cir. 2007), *cert. denied* 554 U.S. 918 (2008). In *Moses*, a decision issued after *Rapanos*, the Ninth Circuit considered "whether a seasonally intermittent stream which ultimately empties into a river that is a water of the United

States can, itself, be a water of the United States." *Id.* at 989. Ultimately, the Ninth Circuit determined that the intermittent tributary, Teton Creek, was part of the waters of the United States, even though the channel held water continuously for only two months out of the year. In so holding, the Ninth Circuit relied on the following reasoning:

> [T]here is no reason to suspect that Congress intended to exclude from 'waters of the United States' tributaries that flow only intermittently. Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage . . . . Rather, as long as the tributary would flow into the navigable body of water 'during significant rainfall,' it is capable of spreading environmental damage and is thus a 'water of the United States' under the Act.

*Id.* at 989.

The *Moses* decision was issued after *Rapanos* and recognizes that a seasonally intermittent, non-navigable tributary can fall within the definition of "waters of the United States," provided that "the tributary would flow into a navigable body of water during significant rainfall" and is "capable of spreading environmental damage." 496 F.3d at 989. The Low Line Canal meets this standard.

The fact that the Low Line Canal is man-made is of no moment. The canal is part of a tributary system connecting navigable waters upstream and downstream for six to eight months of the year. Its man-made nature makes it no less capable of carrying pollution to navigable and interstate waters. Moreover, there are many water-ways in the Intermountain West that have been re-routed, re-countered, and re-channeled in an effort to control, store, and use the limited water we have. Excluding these water-ways from the

**ORDER - 8**

jurisdiction of the CWA when they might otherwise constitute tributaries of navigable waters makes little practical sense.

In sum, the Court is satisfied that the Low Line Canal meets the definition of "waters of the United States" as articulated by the plurality opinion in *Rapanos*. Though man-made, it is a "relatively permanent" tributary of navigable waters and thus capable of spreading pollution in an interstate fashion.

      b.    *Justice Kennedy Concurrence*

The Low Line Canal also meets the standard for "waters of the United States" articulated by Justice Kennedy in *Rapanos*. In the *Rapanos* decision, Justice Kennedy authored a separate opinion concurring in the judgment. *See id*. at 759-787 (Kennedy, J., concurring in judgment). Justice Kennedy found the plurality's interpretation of the term "waters of the United States" to be "inconsistent with the Act's text, structure, and purpose" and "making little practical sense in a statute concerned with downstream water quality." *Id*. at 776. Focused on the wetlands issue, Justice Kennedy concluded that the assessment of jurisdiction differs depending on whether the United States is seeking to regulate wetlands adjacent to navigable-in-fact waters or wetlands adjacent to non-navigable tributaries.

Where the United States seeks to regulate wetlands adjacent to traditional navigable waters, Justice Kennedy concluded that the United States's assertion of jurisdiction is "sustainable under the Act by showing evidence of adjacency alone." *Id*. at 780. However, when the United States seeks to regulate wetlands adjacent to non-

ORDER - 9

navigable tributaries, Justice Kennedy states it must present evidence to a jury that the wetlands have a "significant nexus" to waters that are navigable "in the traditional sense." *Id*. at 779. Wetlands possess the "requisite nexus" if the wetlands "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other waters more readily understood as 'navigable.'" *Id*. at 780.

It is an open question as to whether Justice Kennedy's concurrence applies in the tributary context. *See Benjamin v. Douglas Ridge Rifle Club*, 673 F.Supp.2d 1210 (D. Or. 2009) (holding "Justice Kennedy's significant nexus test is inapplicable to determining the jurisdictionality of tributaries to waters of the United States. . . . Justice Kennedy limits the applicability of his legal standard to wetlands adjacent to jurisdictional waters); *but see Environmental Protection Information Center v. Pacific Lumber Co.*, 469 F.Supp. 2d 803, 823 (N.D.Cal. 2007) (using the significant nexus test to analyze CWA jurisdiction over of a non-navigable tributary); *United States v. Robison*, 505 F.3d 1208 (same). That question is of some significance here, where the Low Line Canal is not a wetland; rather, it is a non-navigable tributary providing a direct flow of both water and discharge to navigable waters for a substantial part of each calendar year.

Nonetheless, the Low Line Canal is non-navigable and other courts considering this issue have allowed the United States to assert regulatory jurisdiction under either the plurality standard or Justice Kennedy's standard. *See, e.g. Northern California River Watch v. Wilcox*, --- F.3d ---- (9th Cir. Jan. 26, 2011) (WL 238292); *United States v.*

**ORDER - 10**

*Johnson*, 467 F.3d 56, 66 (1st Cir. 2006); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009). *See also Northern California River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir.2007) (holding that "Justice Kennedy's concurrence provides the controlling rule of law *for our case*")(emphasis added). Accordingly, but also out of an abundance of caution, the Court also considers whether the requisite "significant nexus" exists between the Low Line Canal and waters that are or were navigable-in-fact.

The Government's evidence is sufficient to support a finding that a "significant nexus" exists between the Low Line Canal and the Snake River. First, the seasonal connection between the Low Line Canal and the Snake River via the perennial stream, Deep Creek, is a direct, open surface water connection for six to eight months of the year. The mere connection between the various waterways is a nexus. Combined with the Government's expected evidence as to the volume and the time period of the water flow in the canal, it is also a sufficient, "significant nexus." Second, the Government alleges that samples of both Deep Creek and the Low Line Canal reflect that they are significant contributors of total suspended solids (sediment) and coliform bacteria to the Snake River. *Government's Opposition to Motion to Dismiss*, p. 5 (Dkt. 40). At the point where Deep Creek flows into the Snake River, the Snake River fails to meet total maximum daily load (TMDL) targets for sediment and phosphporous. *Id.* This direct impact on the biological, chemical, and physical integrity of the Snake River also provides a "significant nexus" between the Low Line Canal and the Snake River.

Defendant suggests that the "significant nexus" does not exist where, as he alleges here, the closest navigable water is 421 miles away at the Port of Lewiston, Idaho. However, the Government has set forth allegations that the Snake River constitutes waters that are navigable-in-fact. Accordingly, and as a threshold matter, the Court finds that the Government's allegations are sufficient to establish a "significant nexus" between the Low Line Canal and the Snake River.

In short, the Government's allegations are sufficient to support a finding that the Low Line Canal meets the statutory and regulatory definitions of "waters of the United States." This finding is consistent with the *Rapanos* decision.

B.  **Discharges Into Dry Bed of Canal**

Defendant contends that the March and November discharges do not trigger federal jurisdiction, because there was no water flowing in the canal bed at that time and there is no evidence that the pollutants were carried downstream. This argument is foreclosed by Ninth Circuit precedent. *See Moses*, 496 F.3d 984 (9th Cir. 2007), *cert denied* 554 U.S. 918 (2008).

In *Moses*, the defendant was convicted of bulldozing Teton Creek and discharging dredge and fill material into the dry bed of the Teton Creek without a Section 404 permit. The defendant in *Moses* argued that CWA jurisdiction did not exist when there was no water in Teton Creek.

The Ninth Circuit rejected defendant's argument and determined that Teton Creek is a water of the United States whether or not there is water flowing through it. *Id.* at 989.

ORDER - 12

The Ninth Circuit reasoned as follows, "[c]ommon sense tells us that . . . the mere fact that pollutants are deposited while this part of Teton Creek is dry cannot make a significant difference. . . . To hold otherwise would countenance significant pollution of waters of the United States as long as the polluter dumped the materials at a place where no water was actually touching them at the time." *Id.* at 991 (citations omitted).

This holding is binding precedent, and it is also consistent with the general approach of the CWA. The CWA is focused upon the discharge itself, not on its impacts. Thus, the CWA does not require a showing that there was "a deleterious effect upon downstream waters." *United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006). "To state a violation of the CWA, the Government need only show that the Defendant discharged a pollutant into a water of the United States from a point source without a permit." *Id.* (citing *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141-42 (10th Cir. 2005)).[1]

---

[1] The Court notes an unpublished decision out of the Central District of Illinois stating the issue as follows:

> The CWA is clear as to the substantive elements required to establish criminal liability under the CWA, and harm-related evidence is not one of the elements. If Congress intended "harm-related" evidence to be part of the inquiry in proving a criminal violation of the CWA, Congress would have said so. Congress did not. Indeed, there is nothing in the statutory provision that provides a definition of "harm."

*United States v. Lippold*, No. 06-30002, 2006 WL 3780983, at *2 (C.D. Ill. 2006).

**ORDER - 13**

Moreover, as the plurality opinion in *Rapanos* states, "no one contends that federal jurisdiction appears and evaporates along with the water." *Rapanos*, 547 U.S. at 733, n.6. Once a seasonal waterway falls within the CWA definition of "waters of the United States," it is considered a water of the United States whether or not there is actually water in it at the time of discharge.

C.  **Low Line Canal as a Point Source**

Also relying upon the *Rapanos* decision, Defendant argues that the Low Line Canal cannot be "waters of the United States," because it is more appropriately described as a "point source." *See Rapanos*, 547 U.S. at 735. In addition, the Government offers an alternative argument for liability contending that, if it cannot establish that the Low Line Canal is "waters of the United States," then it can establish a discharge from Low Line Canal, as a point source, into Deep Creek. *Government's Trial Brief*, p. 17 (Dkt. 29).

The Court finds that a single waterway or channel that is "waters of United States" in terms of CWA jurisdiction, may also be described appropriately as a "point source," depending upon the particular circumstances of the discharge.

In excluding intermittent waterways from the definition of "waters of the United States," the plurality opinion in *Rapanos* relied, in part, on the CWA's separate definitions for "waters of the United States" and "point sources." *Id.* The plurality opinion described that the definition of "point source" more aptly described channels and conduits with intermittent flows of water. *Id.* In addition, the plurality opinion described

ORDER - 14

the definition of "discharge" generally requires a distinction between the terms "navigable waters" and "point source" to make any sense.[2] *Id.*

However, the plurality opinion does not state that every channel must either be a "point source" or a "navigable water" for all purposes. *See National Assn. of Home Builders v. United States Army Corps of Engineers*, 699 F. Supp.2d 209, 216 (D. D.C. 2010) (analyzing *Rapanos* and finding that a ditch, though included in the definition of a point source, may, under the certain circumstances, otherwise qualify as "waters of the United States"). Instead, it would appear that a ditch or canal that otherwise falls within the definition of "waters of the United states," may, in certain circumstances and depending upon the discharge, also constitute a point source for a discharge into a different "water of the United States." There is nothing in *Rapanos* that would foreclose this result.

**D.     Other Concerns Rooted in Concepts of Federalism**

Defendant also argues that the invocation of federal jurisdiction over the Low Line Canal is an impermissible impingement on states' rights to regulate land and water use. He argues:

> [T]he Idaho State Department of Agricultural has played a significant role in monitoring Defendant's dairy operations. Given this well-documented role, the insertion of federal regulators into the picture will significantly diminish the

---

[2] The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

ORDER - 15

> "primary responsibilit[y]" of the State of Idaho, contrary to
> the express policy of the CWA.

*Memorandum in Support of Motion to Dismiss*, p. 5 (Dkt. 38).

In a reply brief in support of the Motion to Dismiss, Defendant further argues that the federal government lacks the authority to enforce the CWA on the Low Line Canal under the Carey Act. Defendant argues that the Carey Act establishes the state's proper role over the management of canals. *Supplemental Brief in Support of Motion to Dismiss*, p. 4 (Dkt. 44). In addition, Defendant argues that the State of Idaho has not ceded its authority over the canals but has actively regulated Defendant's use of the canal through the Department of Agriculture's regulation of dairy farm operations. *Id.* at p. 6.

The Court is satisfied that its finding of CWA jurisdiction over the Low Line Canal does not constitute an impermissible impingement on states' rights. While the Department of Agriculture manages certain aspects of Defendant's dairy operations, it does not foreclose the federal government's role in regulating discharges into navigable water. This federal role over water quality in the nation's navigable waterways does not supplant the Department of Agriculture's management of dairies; it complements it. Moreover, there is nothing about this enforcement action that would violate the Carey Act or otherwise undermine the state's role in managing water rights or irrigation companies.

The federal government has a significant and necessary role in regulating the nation's navigable waters, including their water quality. As the United States Supreme Court recognizes, "[i]t has long been settled that Congress has extensive authority over

this Nation's waters under the Commerce Clause." *Kaiser Aetna v. United States*, 444 U.S. 164, 173 (1979). This includes "the power to regulate waters to limit pollution, prevent obstructions to navigation, reduce flooding, and control watershed development." *See United States v. Hubenka*, 438 F.3d 1026, 1032 (10th Cir. 2006). As all the Justices agreed in *Rapanos*, this power includes, to some degree, the authority to regulate non-navigable waters.

Because the Low Line Canal is a "relatively permanent" tributary with a "significant nexus" to navigable waters, it is appropriately subject to federal jurisdiction. That does not mean that the states do not also have a role in the regulation of Defendant's dairy or the Low Line Canal. It simply means that the federal government also has an appropriate role with regard to pollutant discharges under the CWA.

In short, because the Low Line Canal meets the legal standards set forth in the CWA as provided in the Act, the regulations, and United States Supreme Court precedent, it constitutes waters of the United States. This finding does not disturb the balance of power between federal and state governments but reflects an appropriate role for federal intervention apparently welcomed by state authorities.[3]

## CONCLUSION

Defendant's allegations, if proven, support a finding that the Low Line Canal falls within the definition of the "waters of the United States" and, thus, is subject to federal

---

[3] One of the witnesses in the United States case against Defendant is an inspector from the Idaho Department of Agriculture.

jurisdiction under the Clean Water Act. Therefore, the Court will deny Defendant's Motion to Dismiss.

## ORDER

In accordance with the foregoing, Defendant's Motion to Dismiss (Dkt. 37) is DENIED.

DATED: **March 18, 2011**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge